Ronald **RACZYNSKI,** Appellant,

v.

Carol Joyce **RACZYNSKI,** now Watson, Appellee.

No. 48367.

Court of Appeals of Oklahoma, Division No. 2.

Sept. 28, 1976.

Rehearing Denied Oct. 14, 1976.

Certiorari Denied Nov. 30, 1976.

Released for Publication by Order of Court of Appeals Dec. 2, 1976.

George D. Allen, Vaughn, Allen, Stack & Huckaby, Chickasha, for appellant.

Robert B. Park, Park, Nelson & Caywood, Chickasha, for appellee.

BRIGHTMIRE, Judge.

April 7, 1975, Ronald Raczynski was adjudged to be "technically guilty of contempt in failing to make child support payments after October, 1974" and given ten days to "catch up" to avoid being "officially . . . adjudged to be in contempt of court." The appealing father of two children, a boy 16 and a girl 11, assails the decision because it fails to give him credit for child support overpayments totalling

around $7,000 he voluntarily made before October, 1974, as well as a $11,750 interest in real estate conveyed to the mother for child support use—a ruling that is inequitable and unjust under the circumstances involved.

I

Less than a week before Christmas 1972, Raczynski filed suit asking for a divorce from Carol Raczynski, now Watson—a woman whom he had married 14 years earlier. There was no contest. The parties worked out an agreement regarding division of property, child custody, and child support to be paid by the father. Carol signed a waiver of hearing notice and on January 26, 1973, a divorce decree was signed by the court incorporating the agreement terms which, among other things, ordered Ronald to pay Carol $175 for each child's support, or $350 every month, beginning January 4, 1973.

Ronald began making these payments. Shortly after he had made the second one, Carol came to him, he says, and said she needed some additional money. Carol was reminded of the pre-decree agreement, but she said if Ronald wouldn't give her more money, she would move to someplace like Kansas City where she could either find a man to support her or a job. Ronald did not want to see the children uprooted and moved, so he agreed that he "would pay her additional monies in the manner of prepayment . . . of child support." He explained the matter further saying, "On [February 15], for instance, I wrote her an extra check for $350 . . . as an extra month's child support, and at that time my idea and our agreement was that I would make these payments as necessary in the amount of a month's support . . . ."

But this still did not satisfy Carol. In March she asked for even more money and

the father agreed to increase the second payment to $450, making a total monthly payment of $800—an amount he paid for 13 months, or through May, 1974. The oral agreement further specified, according to Ronald, that continuation of such "prepayments" was contingent on (1) his ability to do so and (2) her staying single.

Carol went to work for and later, on June 10, 1974, married Charles Watson, owner of Watson Plumbing Company. Ronald found out about this from his daughter not long afterwards and stopped making the prepayments.

In the latter part of July, Carol called Ronald who was in Watertown, South Dakota and wanted him to sign his one-half interest in their former home to her. She said they were thinking about selling the house and it would make it easier to sell if it were in her name only.

"I told her," said Ronald, "that I would consider it, but only upon the basis that it would . . . apply just like the other cash payments or prepayments, and it would, if I ever elected, . . . apply towards the child support payments, and we agreed that the amount would be set . . . if and when she sold the house."

On August 1, 1974, Ronald and his new bride signed the requested deed and returned it to Carol.[1]

After making the regular $350 payment in October, 1974, Ronald told Carol that business was off and he would not be making any payments for a while. At that time, according to Ronald, Carol did not indicate she would renege on their agreement. The following February, however, Carol called him and wanted more money. She also had her attorney write him about more money. And when this failed to achieve results, she filed an application requesting the court to cite Ronald for con-

---

1. At the hearing Carol testified that the Watsons had received $500 in earnest money under a contract to sell the property for $36,-500. After paying off a little over $13,-

000 balance due on a note and mortgage on the property, Carol will have left a remaining equity of about $23,500.

tempt of court because of a willful failure to pay child support, which, she alleged, was then (February 24, 1975) in arrears $1,400. Ronald was cited and he countered with a motion to modify the decree by granting him custody of the two children. This citation was heard March 17, 1975. The court asked the lawyers to brief the law for him for reaching a decision.

A few days later Ronald asked the court to punish Carol for contemptuously refusing to permit the children to visit with him. Three days before this citation was to be heard, the trial judge wrote the parties a letter in which he reviewed the evidence he had heard. He recited that Carol admitted receiving $14,750 between January 1, 1973, and October 15, 1974, which was about $7,000 more than ordered by the court. The trial judge identified but did not resolve a factual dispute regarding whether the parties had agreed that this overpayment was "to be credited against future child support payments accruing under the divorce decree." Raczynski said there was such an agreement; Carol said there wasn't. The trial court did not mention the further issue about whether there was a similar agreement concerning the house equity given to Carol.

Following this review the court wrote: "Apparently the Oklahoma Supreme Court has not been called upon to decide this issue[2], at least counsel and the court have been unable to find an Oklahoma case covering the point. However, the Oklahoma divorce statutes came from the state of Kansas, and the Kansas Supreme Court in *Koons v. Koons,* 190 Kan. 65, 372 P.2d 62 in reviewing the trial court held that the father of minor children is not entitled to credit for overpayments to the mother not made in accordance with the court order, and this court feels that the Oklahoma Supreme Court would follow the Kansas Court in this case."

*Koons* is not really in point. It does not involve a mother requesting support money exceeding the court-ordered amount, nor an agreement to apply overpayments and equity in real estate on future installments, nor voluntarily and intentionally made overpayments. The overpayment for which credit was sought in *Koons* was not made by the father but by the U.S. government in the form of an allotment while the father was in military service. The allotment exceeded the court-ordered amount of child support. Following the father's separation from the service, he stopped paying child support on the theory the allotment surpluses constituted prepayment of future child support in the amount of $803.70—a sum for which he was claiming credit. The Kansas court, in rejecting the father's contention, did no more than hold under these circumstances that the government, not the father, had made the surplus payments and there was no basis for considering them prepayments by the father. And so we have to look elsewhere for guidance.

The primary question can be worded this way—Is the father entitled to credit for the $7,000 overpayments voluntarily made by him at the request of the mother?

■ Decisions on the general topic of giving credit for overpayments are meager. Those dealing with it have reached assorted results, most of which arise from differing fact patterns assisted by the invocation of pertinent principles of equity.[3]

---

**2.** It is not clear what issue is being referred to. We are rather sure he isn't referring to a factual issue but to a legal issue. There are at least three possible issues: (1) Is the father entitled to credit for overpayments absent an agreement? (2) Is he entitled to credit if there is an agreement? (3) Is he entitled to credit for the house equity conveyed to the child custodian?

**3.** See e. g., *Cole v. Cole,* 101 Ariz. 382, 420 P.2d 167 (1966); *Tescher v. Tescher,* Colo. App., 491 P.2d 82 (1971); *Jackson v. Jackson,* 306 Ky. 715, 209 S.W.2d 79 (1948); *Mason v. Mason,* 148 Or. 34, 34 P.2d 328 (1934).

Some, however, are founded on the expedience of an inflexible insistence on the strict obedience of a court order. The more just approach is, in our view, one which takes into consideration the particular circumstances of each case and allows credit if it is inequitable to do otherwise. Credit, for instance, was allowed in *Jackson v. Jackson,* footnote 3, under a so-called "compulsion of circumstances" concept where payments made by the father exceeded decree requirements because of having to pay tuition for a child the mother had enrolled in a private school in order to keep the child from losing valuable school credits.

Usually, it is true, there has been a judicial reluctance to allow credit for prior overpayments of support money mainly because of the potential deprivation of future benefits that might be experienced by the child, although at least one court mentioned injustice to the mother, and another concluded it was preventing a father from deliberately flaunting a court order. *Wills v. Glunts,* 222 Ga. 647, 151 S.E.2d 760 (1966); *Hains v. Hains,* 187 Kan. 379, 357 P.2d 317 (1960); *Newton v. Newton,* 202 Va. 515, 118 S.E.2d 656 (1961).

If there is one criterion judicially achieving a rank of importance on the question, it has to be the express or implied consent of the mother to voluntary expenditures made by the father to or on behalf of the children. *Headley v. Headley,* 277 Ala. 464, 172 So.2d 29 (1964); *Chapman v. Chapman,* 177 Or. 239, 161 P. 2d 917 (1945); *Ostrin v. Posner,* 127 Misc. 313, 215 N.Y.S. 259 (1925). See related discussion in *Ediger v. Ediger,* 206 Kan. 447, 479 P.2d 823 (1971). No case have we found, however, which involves an agreement such as the one alleged here. In one case, though, the court treated the father's overpayments as gifts, rejected his claim and, after applauding his generosity,

advised that if he had intended the overage to involve a modification of the court order an explicit agreement to that effect should have been made with the wife. *Loomis v. Loomis,* 221 Ark. 743, 255 S.W. 2d 671 (1953).

■ One consideration looming above all else is that which looks to the child's welfare. The minor dependent must be properly supported and cared for and neither parent by agreement or otherwise should be permitted to shirk his or her legal duty in this regard whether imposed by decree or statute. And if the child's well-being will remain unaffected by the enforcement of an agreement or an otherwise equitable adjustment of an interparental maintenance dispute, we can think of no good reason why credit should be denied for overpayments made in good faith.

■ In the case at bar, the record is not sufficient for us to make an intelligent determination of the material issues involved. First of all, the court is not apprised of what effect, if any, the requested credit allowance will have on the children. Such effect it is necessary to ascertain before other matters can be considered.[4] If the mother has no means available to maintain the children, other circumstances become immaterial. But should the situation be otherwise, then the court should inquire into other material matters such as, in this case, the alleged agreement. If one is found to have been made, then it would seem to be inequitable for the court to lend its aid in enforcing the letter of a decree at the behest of one who had sought and obtained the benefits thereof in advance. We also recognize it is possible under the evidence for the court to infer that Carol had not sought advance payments of child support, but alimony for the benefit of Carol personally—a gift which is not to be credited on the child support order.

4. The record is silent as to Carol's income or assets—except equity in the house, which is discussed elsewhere.

**430**

Therefore, we hold that if the child's welfare is not adversely affected the court should equitably adjust the rights of the parties in the matter of overpayments of child support, or if there is an express agreement the court should enforce it.

Finally there remains the question regarding equity in the parties' former home. It stands on a little different footing than the overpayment issue but, as we shall see, is interrelated to the extent of providing potential funding for any credit allowed. In our judgment, the weight of the evidence is that the consideration for Ronald's transfer of his equity was probably Carol's implied agreement to apply it on future child support payments.[5] Under these circumstances, once the property is sold, Carol constructively becomes trustee of one-half the cash realized from a sale of the equity which, together with the interest it earns, is to be drawn upon for the child support payments if and when requested by the father.

Here again inadequacy of the record prevents us from adjudicating the matter. As we mentioned earlier in footnote 1 Carol said she and her new husband had contracted to sell the house for $36,500 against which there was a mortgaged obligation of $13,000. Whether this sale was ever consummated, we do not know. If it was, then Carol became trustee of about $11,750 and accountable to Ronald for preservation of such proceeds for the support of the children. This money is available for paying off accrued as well as future child support obligations of the father under the decree.

The cause is therefore reversed and remanded for further proceedings consistent with the view herein expressed.

BACON, P. J., and NEPTUNE, J., concur.

5. The agreement served to both simplify sale of the property for Carol and enable Ronald to realize appropriate consideration for the conveyance.